J-S18030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.K., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M. AND B.K., PARENTS | : | |
| | : | |
| | : | |
| | : | No. 1881 MDA 2018 |

Appeal from the Order Entered October 4, 2018
In the Court of Common Pleas of Mifflin County Orphans' Court at No(s):
2017-00026

| | | |
|---|---|---|
| IN THE INTEREST OF: E.K. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M. AND B.K. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1882 MDA 2018 |

Appeal from the Order Entered October 4, 2018
In the Court of Common Pleas of Mifflin County Orphans' Court at No(s):
25 of 2017

BEFORE:   BOWES, J., NICHOLS, J., and STEVENS, P.J.E. *

MEMORANDUM BY NICHOLS, J.:        **FILED: MAY 3, 2019**

A.M. (Mother) and B.K. (Father) (collectively, Parents) appeal from the orders granting the petitions filed by the Mifflin County Children and Youth Social Services (CYS or the Agency) to involuntarily terminate their parental rights to their minor female child, E.K., born in May of 2007, and their minor

---

* Former Justice specially assigned to the Superior Court.

male child, B.K., Jr., born in March of 2009 (collectively, Children) pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]  We affirm.

The trial court has fully and accurately set forth the procedural history and factual background of this appeal in its opinions entered with regard to both Children, which we adopt herein.  *See* Trial Ct. Op., 10/4/18, at 1-5.  On December 7, 2017, CYS filed petitions to terminate Mother's and Father's parental rights to Children.   On February 5, 2018, March 5, 2018, and September 28, 2018, the trial court held evidentiary hearings on the petitions.

At the hearing on February 5, 2018, Stephen S. Snook, Esq., represented CYS.  Mother and Father were present with their counsel, Michael S. Gingerich, Esq.  The guardian *ad litem* for Children, Stuart A. Cilo, Esq., was also present, but Children were not present and did not testify.  CYS first presented the testimony of Nicole Patkalitsky, the assistant administrator at CYS.  Ms. Patkalitsky was involved in placement decisions, Family Intervention Crisis Services (FICS) reviews, and supervision of the placement unit during

---

[1] On December 12, 2018, this Court, acting *sua sponte*, consolidated Parents' two appeals from both orders into one appeal, which we will address in a single memorandum for ease of disposition.   We observe that B.K., Jr.'s birth certificate, which is in the certified record, reflects that B.K., Jr., was born in March of 2009, but the trial court's opinion contains a typographical error, and states that B.K., Jr., was born in March of 2019.  *See* Trial Ct. Op., 10/4/18, at 1; *see also* N.T., 2/5/18, at 84-85, 123; N.T., 3/5/18, at 4 (stating, respectively, that B.K., Jr., was in the third grade and was eight years old). We add that E.K. was eleven years old when the trial court granted the petitions to terminate Parents' rights to Children, and will be turning twelve years old in 2019.   *Cf.* 23 Pa.C.S. § 2711(a)(1) (discussing consent to adoption).

the training of the new supervisor. N.T., 2/5/18, at 6. She was familiar with Children and Parents in this case. *Id.* at 6-7.

Next, CYS presented the testimony of Darlene Lopez, a FICS counselor assigned to the family's case. *Id.* at 40-41. CYS then presented the testimony of Allison Dabback, a case manager for Families United Network and who manages the foster home where Children have been in placement. *Id.* at 79-80. Children are placed with their paternal aunt (Foster Mother), and her husband. *Id.* at 81. Next, CYS presented the testimony of Foster Mother. *Id.* at 93-94. Mother and Father testified on their own behalf. *Id.* at 113, 173.

On February 23, 2018, the trial court appointed John McCullough, Esq., as legal interest counsel for Children, and scheduled a hearing on the termination petitions to occur on March 5, 2018. On March 5, 2018, the trial court convened a hearing to discuss the need for the appointment of separate legal interest counsel and guardian *ad litem* (GAL) for Children.[2] N.T., 3/5/19,

---

[2] *See In re Adoption of L.B.M.*, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); *see also In re T.S.*, 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (finding unascertainable the preferred outcome of a child who is too young or non-communicative in holding a child's statutory right to counsel is not waivable, and reaffirming the ability of an attorney-GAL to serve a dual role and represent a child's non-conflicting best interests and legal interests). *Cf. In re Adoption of D.M.C.*, 192 A.3d 1207 (Pa. Super. 2018) (vacating and remanding where the record was unclear in what capacity the attorney had been appointed to represent the children and whether the

at 2. At the hearing on March 5, 2018, Attorney McCullough stated that he had met with Children, and he requested the opportunity to participate in an additional evidentiary hearing on the matter. N.T., 3/5/18, at 6. The trial court directed Attorney McCullough to review the transcripts of the February 5, 2018 hearing, and then submit a written report to the court. *Id.* at 26-27.

---

attorney had ascertained the children's legal interests prior to the hearing); *In re Adoption of M.D.Q.*, 192 A.3d 1201 (Pa. Super. 2018) (vacating and remanding where the record did not indicate that counsel attempted to ascertain the children's preferred outcomes, and the record did not reflect the children's legal interests); *In re Adoption of T.M.L.M.*, 184 A.3d 585, 587-91 (Pa. Super. 2018) (vacating and remanding for further proceedings where the attorney admitted she did not interview the six-year-old child to ascertain the child's preferences).

Here, Attorney McCullough spoke with Children on March 3, 2018, regarding their preferred outcomes. According to Attorney McCullough, Children expressed preferences to remain permanently with Foster Mother and initially agreed to adoption, but then indicated that they wanted Parents to remain as their mother and father. *See* N.T., 3/5/18, at 3-6, 12-15, 21-22. The trial court acknowledged and considered the Children's desires at the hearing. *See id.* When rendering its decision, the trial court noted that the Children wished to permanently remain with Foster Mother and visit with Parents when rendering its decision. Trial Ct. Op., 10/4/18, at 11.

We note that after setting forth the Children's preferences, Attorney McCullough concluded that termination of Parents' rights was proper. Additionally, Attorney McCullough did not file a brief in this appeal. However, because Attorney McCullough consulted with Children and advocated for Children's preferences throughout the hearing, we conclude that he substantially complied with his duties as legal counsel. We remind legal counsel that the representation of a child's legal interest encompasses a duty to advocate for a child's preferred outcome, and this duty extends to an appeal.

Upon receipt of Attorney McCullough's report, the court would then decide whether a supplemental hearing would be necessary. *Id.*

On September 4, 2018, the trial court scheduled a half-hour supplemental hearing on the termination petitions for September 28, 2018.[3] At the hearing on September 28, 2018, Attorney McCullough presented the testimony of Ms. Lopez. N.T., 9/28/18, at 4. Attorney McCullough then presented the testimony of Brenda Dobson, who is a CYS employee assigned to the family in December of 2017. Ms. Dobson observed the visits between Parents and Children at FICS and observed Children in their foster home. *Id.* at 23-24.

On October 4, 2018, the trial court entered the orders granting CYS's petitions to involuntarily terminate Parents' parental rights to Children pursuant to the Adoption Act, 23 Pa.C.S. § 2511(2), (5), (8), and (b). On November 5, 2018, Parents timely filed notices of appeal from the October 4, 2018 orders,[4] along with concise statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Parents raise the following issues:

---

[3] Attorney McCullough's report was not docketed as being filed with the trial court and is not in the certified record. However, as noted above, the trial court convened a supplemental hearing.

[4] The thirtieth day following the entry of the orders fell on Saturday, November 3, 2018. Therefore, Parents' notices of appeal filed the following Monday were timely filed. *See* 1 Pa.C.S. § 1908.

Did the trial court err in finding that there was clear, convincing and sufficient evidence establishing the statutory grounds for involuntary termination of parental rights?

Did the trial court err in finding that there was clear, convincing and sufficient evidence that the involuntary termination of parental rights was in the "best interests" of each child?

Parents' Brief at 4.

Parents stated their issues somewhat differently in their concise statement of errors complained of on appeal, but nevertheless preserved challenges to the sufficiency of the evidence to support the termination of their parental rights under Section 2511(a)(2), (5), (8), and (b). **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal).

Specifically, Parents suggest that they were able to perform their parental duties "for several years, at least until the time the trial court declared the [C]hildren to be dependent on June 17, 2016." Parents' Brief at 10. Parents continue that they either completed or substantially complied with the goals set for reunification by addressing their housing, financial, and mental health issues. **Id.** at 12, 14-15. Lastly, Parents assert that the trial court failed to consider the effect that termination would have on Children in light of the bonds between Children and Parents. **Id.** at 17.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, . . . 9 A.3d 1179, 1190 ([Pa.] 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, . . . 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, . . . 838 A.2d 630, 634 ([Pa.] 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, . . . 650 A.2d 1064, 1066 ([Pa.] 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained: "[t]he standard of clear and convincing evidence is defined

as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will consider Section 2511(a)(2) and (b).

Section 2511(a)(2) and (b) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The Pennsylvania Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of J.J.*, . . . 515 A.2d 883, 891 ([Pa.] 1986) (quoting *In re: William L.*, . . . 383 A.2d 1228, 1239 ([Pa.] 1978)).

*S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding

the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). *See In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not

- 10 -

necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted).

Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See T.S.M.*, 71 A.3d at 267 (quoting *K.K.R.-S.*, 958 A.2d at 535). The Supreme Court stated that "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.*

- 11 -

Therefore, the court may emphasize the safety needs of the child. **See K.Z.S.**, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite the existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." **In re B.,N.M.**, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Having reviewed Parents' arguments and the record, this Court finds the trial court's decision to terminate the parental rights of Father and Mother under Section 2511(a)(2) and (b) is supported by competent, clear, and convincing evidence in the record. **S.P.**, 47 A.3d at 826-27. We adopt the trial court's discussion set forth in its opinions as to Children with regard to Section 2511(a)(2) and (b), because its credibility and weight determinations are supported by the evidence in the record. **See** Trial Ct. Op. at 5-12.

We add that Children were removed from Parents based on a lack of food. Children told CYS that they had not eaten since the day before they were removed from the home. **See** N.T., 2/5/18, at 9. As noted by the court, E.K. would also hoard food even after being placed with Foster Mother. **See id.** at 54; Trial Ct. Op. at 11. Additionally, the court heard testimony that during visits, Parents brought snacks that E.K. did not eat, and E.K. would return to Foster Mother hungry. **See** N.T., 2/5/18, at 48, 52. The court also

found Parents were not only uncooperative with FICS, but also refused assistance with budgeting and shopping for food. *See id.* at 54; Trial Ct. Op. at 3.

Although Parents testified that they love Children, *see* N.T., 2/5/18, at 147, 161, 183, this Court has held that a parent's love of his child, alone, does not preclude a termination. *See In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *C.L.G.*, 956 A.2d at 1007 (quoting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." (citation omitted)). Moreover, there were corresponding bonds between Children and Parents. However, under the circumstances of this case, we cannot conclude that the trial court erred in its conclusion that terminating those bonds best served the needs and welfare of Children. *See T.S.M.*, 71 A.3d at 267; *K.Z.S.*, 946 A.2d at 763. Accordingly, we affirm the trial court's orders on the basis of the discussion in the trial court's opinion.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/3/2019

CHILDRENS FAST TRACK

## IN THE COURT OF COMMON PLEAS OF MIFFLIN COUNTY, PENNSYLVANIA

## ORPHAN'S COURT DIVISION

In the Interest of: E.K.                    :        PARENTAL ACTION NO. 25 of 2017

In the Interest of B.K., Jr.                :        PARENTAL ACTION NO. 26 of 2017

## OPINION

**AND NOW**, this 4th day of October, 2018, Mifflin County Children and Youth Social Services ("the Agency" hereafter) have filed a petition to terminate the parental rights of natural mother, A.M. ("Mother" hereafter), and natural father, B.K. ("Father" hereafter), with respect to their children, E.K. and B.K., Jr. A termination hearing was held on February 5, 2018 and supplemental hearings were held March 5, 2018 and September 28, 2018. This Opinion is in support of the Court's Order, entered this date, terminating Mother and Father's parental rights.

### FACTUAL AND PROCEDURAL HISTORY

E.K. was born on May 24, 2007 and was 10 years old at the filing of the Petition to Terminate. B.K., Jr. was born on March 18, 2019 and was 8 years old at the time of the filing of the Petition to Terminate. E.K. and B.K., Jr. were adjudicated dependent with disposition of legal and physical custody with the Agency on June 17, 2016, due to unsafe and instable housing and income concerns. Testimony provided that the Agency became involved after reports that Mother and Father were living in a residence with at least five to six other people. Mother and Father were about to be evicted and planned on moving to a motel. The Agency had concerns with the lack of food in the home, the safety and security of the current residence and whether the basic needs of the children were being met.

The Agency developed three Child Permanency Plans with parental objectives for both Mother and Father. The Agency asked Mother and Father to identify and secure a permanent residence for

1

E.K. and B.K., Jr. that was free of safety and sanitary concerns and asked that they obtain and maintain a stable income in order to properly provide for the children. The Agency further requested Mother and Father work on their mental health needs through counseling and medication management and that they demonstrate the necessary parenting skills to provide for E.K. and B.K., Jr.'s physical, emotional and mental well-being. Finally, Mother and Father were asked to cooperate with the Agency and work with all service providers.

To help Mother and Father meet the Agency's objectives a referral was made to Family Intervention Crisis Services ("FICS" hereafter). FICS opened with Mother and Father for Reunification Services on June 8, 2016. In order to assist Mother and Father in reunification, FICS provided Mother and Father with parent education, counseling sessions, lifestyle checks and visitation sessions.

Parent education sessions were specifically tailored to help Mother and Father meet the Agency's objectives and to further help Mother and Father create a lasting bond with the children. Parent education included lessons on parentification, validation of feelings, the importance of reflective listening and communication and how to communicate and interact effectively with their children. This included discussions on age appropriate activities and conversations. Sessions also educated parents on the importance of consistency and positive reinforcement and helped parents establish a bond with their children through activities. These sessions also focused on time and money management. Mother and Father attended only 6 visits of the 32 that were offered to them. Mother was combative during these sessions and believed sessions were a waste of her time. Furthermore, testimony provided that she threw a binder at a parent educator after becoming upset. Mother testified that the Agency and FICS failed to make their objectives clear and avers she was unapprised as to their expectations. Mother testified that service providers expected her to be perfect. Furthermore, Mother

2

testified that she was not willing to work with service providers because they always brought up the past and she was more concerned with working toward the future.

While Mother and Father failed to attend parent education sessions, they were more faithful to attend visits with the children. Of the 59 supervised visits offered by FICS, Mother and Father attended 48 visits. However, during these visits, FICS staff noted that Mother ignored E.K. and B.K., Jr. several times throughout multiple visits. Testimony provided that there was no structure during visits and E.K. and B.K., Jr. did not listen to Mother and Father. FICS staff had to direct E.K. and B.K. Jr. during their visits. FICS staff requested Mother and Father bring a nutritious meal for the children and offered to go to the grocery store with Mother and Father to help them choose healthy foods and how to make a budget. FICS also offered Mother and Father a gift card for food; however, both were refused. FICS staff also believed that Mother and Father favored one of the children over the other and yelled at one child over the other. Mother and Father were visibly annoyed and used annoyed tones when one child attempted to engage Mother and Father in conversation regarding school, holidays, friends and family. Mother and Father were also argumentative with FICS staff while receiving feedback after visits.

FICS staff also requested Mother and Father participate in counseling sessions to work on their mental health, the reason for placement and how to positively move forward. Mother and Father attended 3 out of the 32 sessions. Of the 3 sessions Mother and Father did attend, they left two sessions early. During these sessions, Mother and Father were argumentative, defensive and hostile. Mother and Father blamed the Agency and FICS for their issues and failed to accept responsibility. Mother and Father refused to sign releases or cooperate with the Agency since August of 2016 and refused access to their home. Mother and Father signed a document on September 14, 2016 stating that they no longer wished to participate in counseling or parent education sessions with FICS. For

3

this reason, only 11 lifestyle checks were attempted. Only 5 of the 11 were successful and these checks occurred while Mother and Father were living in the homeless shelter. After moving from the shelter, Mother and Father denied access to the residence where they lived with their friends. As of October 2017, FICS has provided Mother and Father a total of 586 hours of services.

Not only did Mother and Father fail to cooperate with the Agency and FICs through parent education, counseling and lifestyle checks, but Mother and Father also failed to meet any of the objectives created by these Agencies. Mother and Father have failed to secure a permanent residence for E.K. and B.K., Jr. and have failed to maintain a stable income. From the case opening until the filing of the Petition to Terminate, Mother and Father have resided at numerous residents. Mother and Father resided at ███ Woodland Avenue ███████████ when the Agency filed for dependency. Mother and Father then resided in the homeless shelter ████████████ from June of 2016 until September of 2016. Mother and Father then moved in with a friend at ███████ 4th Street ████████████ until May of 2017. Despite numerous requests, the Agency and FICS workers were denied access to this home. Finally, in May of 2017, Mother reported that she was living with Father at ███Logan Street in Lewistown. Testimony provided that the residence on Logan Street was cluttered and dirty. Furthermore, testimony provided that there was no electricity in Mother and Father's bedroom and a water bucket was in the room to collect water draining from the ceiling. There was also some concern about heating in one of the children's rooms. Furthermore, Mother testified that they were a couple months behind on their electric bill.

Not only have Mother and Father failed to secure a permanent residence, Mother and Father have also failed to secure a stable income. Mother has been unemployed from the opening of the case in June of 2016 due to health concerns. Mother testified that she receives $924.00 a month as a survivor benefit from her father. She testified that she will receive this money every month for life.

4

13

Father is also currently unemployed. While Father obtained employment in March of 2017 at Vantage Foods in Carlisle, he chose to quit his job 6 months later in August of 2017.

Mother and Father have also failed to work on their mental health needs through counseling and medication management. Mother attended a mental health intake appointment in December of 2016 at the Geisinger-Lewistown Hospital to begin counseling services. However, Mother did not follow up after the appointment and failed to participate in counseling services. In March of 2017, Mother completed a mental health assessment at Enlighten. Enlighten recommended that Mother participate in medication management and counseling services. To date, Mother has attended four appointments. Mother cancelled one appointment and failed to appear for another appointment. Father has not participated in any psychiatric care to address his mental health needs through counseling or medication management.

At the Permanency Review Hearing held on November 3, 2016, the Court made findings that Mother and Father were not compliant with the permanency plan and had not made any progress towards alleviating the circumstances which necessitated placement. At Permanency Review Hearing held May 5, 2017, the Court found Mother and Father were minimally compliant with the permanency plan but failed to make any progress towards alleviating the circumstances which necessitated placement. Finally, at the Permanency Review Hearing held September 29, 2017, the Court found Mother and Father were minimally compliant with the permanency plan and had made minimal progress towards alleviating the circumstances which necessitated placement.

## DISCUSSION

The court must undergo a two-step analysis when deciding whether to terminate an individual's parental rights. First, the court must determine whether the petitioner proved with clear and convincing evidence one of the grounds for termination stated in 23 Pa.C.S.A. § 2511(a). Next, the

5



court must assess the child's developmental, physical, and emotional needs and welfare in accordance with 23 Pa.C.S.A. § 2511(b) and the best interest of the child standard. The court must consider each case's individual circumstances and the parent's explanations to determine whether the "totality of the circumstances" justifies terminating the parent's rights. *In re B.N.M.*, 856 A.2d 847, 853 (Pa. Super. 2004).

The Agency alleges grounds for termination under 23 Pa.C.S.A. § 2511(a)(2), 23 Pa.C.S.A. § 2511(a)(5) and 23 Pa.C.S.A. § 2511(a)(8). The Court will first address the termination grounds found in all three alleged sections. Then it will separately determine whether terminating Mother and Father's parental rights serves the best interest of the children.

## I. Termination Grounds

### A. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(2)

Section 2511(a)(2) authorizes the court to terminate a parent's rights if:

> "The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

23 Pa. C.S.A. § 2511(a)(2).

The Agency by clear and convincing evidence established the termination grounds found in §2511(a)(2) relative to Mother and Father. Upon obtaining physical and legal custody of E.K. and B.K., Jr., the Agency developed three Child Permanency Plans with parental objectives for Mother and Father. These objectives included: identifying and securing a permanent residence that is free of safety and sanitary conditions; obtain and maintain stable income; ensure mental health needs are met through counseling and medication management; demonstrate parenting skills that meet the children's physical, emotional and mental well-being; and cooperate with the Agency and service providers. The

6



Agency established these objectives to address the circumstances and concerns that necessitated placement, including Mother and Father's history of unsanitary and instable housing, a history of financial instability and Mother and Father's inability to demonstrate proper parenting skills.

Throughout the duration of this case, Mother and Father have made minimal progress towards these objectives. Mother and Father have moved numerous times since placement, as detailed above. While Mother testified that they are currently living in a stable home, the Agency and FICS still have some concerns about the care and condition of the home. Furthermore, testimony provided that Mother and Father are behind $450.00 dollars on their electric bill. While Mother receives a monthly social security benefit, Mother and Father are unable to meet their monthly income needs. Father has failed to obtain and maintain employment and Mother and Father have failed to address their mental health needs. Further, Mother and Father have consistently refused to cooperate with the Agency and other service providers. Mother and Father failed to provide releases to the Agency and FICS and have refused services since September of 2016. Mother and Father failed to utilize any of the services offered to them by service providers. Mother and Father attended only 6 of 32 parent education sessions, 3 out of 32 counseling sessions and 48 out of 59 visits with E.K. and B.K., Jr. Mother and Father blamed the Agency and FICS service providers for their problems and were argumentative, defensive and hostile towards their recommendations. In turn, the Agency and FICS still have the same concerns for the health and safety of the children that they had at the time of the filing for dependency.

Therefore, the Court is satisfied that the Petitioners have proved by clear and convincing evidence that Mother and Father have refused or failed to perform their parental duties and that there is a continued incapacity that has caused and will continue to cause E.K. and B.K., Jr. to be without

7

16

capable of performing their parental duties and responsibilities. E.K. and B.K., Jr. have been in custody for approximately twenty months and the conditions which led to their placement continue to exist.

At this time, Mother and Father cannot provide essential parental care necessary for E.K. and B.K., Jr.'s physical and mental well-being. Therefore, as Mother and Father have not remedied the behavior that led to E.K. and B.K., Jr.'s placement in foster care and termination would best serve E.K. and B.K., Jr.'s needs and welfare, the Court finds grounds to terminate Mother and Father's parental rights pursuant to § 2511(a)(5).

## C.  Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(8)

The court may terminate a parent's parental rights under § 2511(a)(8) if:

> "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would serve the needs and welfare of the child."
> 23 Pa.C.S.A. § 2511(a)(8).

The Agency by clear and convincing evidence also established the termination grounds found in § 2511(a)(8). As previously noted above, at the time of the hearing, E.K. and B.K., Jr. have been in foster care for approximately twenty months and the conditions which led to their placement continue to exist. Mother and Father have failed to demonstrate a serious intent to re-cultivate a parent-child relationship or to demonstrate a willingness and capacity to undertake the parental role. Mother and Father do not believe they need help and therefore, have not worked towards reunification services. After being provided services through FICS, the same conditions which led to the removal of E.K. and B.K., Jr. have not been remedied. At all three Permanency Review Hearings, this Court found that there had been minimal to no compliance with the permanency plan and that Father and Mother have made little to no progress in alleviating the circumstances with necessitated the original placement.

9

essential parental care, control or subsistence necessary for their physical and mental well-being that cannot be remedied in a timely manner. 23 Pa.C.S.A. §2511(a)(2).

## B. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(5)

Section 2511(a)(5) permits the court to terminate parental rights when:

> "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child."

23 Pa.C.S.A. § 2511(a)(5).

The Agency by clear and convincing evidence also established the termination grounds found in § 2511(a)(5). At the time of the hearing, E.K. and B.K., Jr., have been in foster care for approximately twenty months. FICS service providers offered numerous services to Mother and Father that would have allowed them, through fixing their own physical and mental health needs, to provide E.K. and B.K., Jr. with the love, protection and necessities they need. However, despite the plethora of services that have been offered to Mother and Father, there has been a lack of progress and no significant change.

As previously mentioned, Mother and Father were argumentative, defensive and hostile with service providers throughout dependency proceedings. Mother and Father refused parent education, counseling and lifestyle checks. Furthermore, Mother and Father failed to meet the Agency's objectives and failed to demonstrate that they are capable of meeting the physical, mental and emotional needs of E.K. and B.K., Jr. Mother and Father failed to work towards the return of E.K. and B.K., Jr. by cooperating with the Agency to obtain rehabilitative services necessary for them to be

8

As the conditions that led to E.K. and B.K. Jr.'s placement have not been remedied and terminating Mother and Father's parental rights would best serve the needs and welfare of E.K. and B.K., Jr. who are happy, healthy, and well-adjusted in their foster home, the Court finds grounds to terminate Mother and Father's parental rights pursuant to §2511(a)(8).

## II. The Children's Best Interests

Having found the Agency established with clear and convincing evidence the termination grounds stated in §§ 2511(a)(1), 2511(a)(5) and 2511(a)8), the Court must determine whether terminating Mother and Father's parental rights serves E.K. and B.K., Jr.'s best interest. As mentioned, the Court must give "primary determination" to the child's "developmental, physical, and emotional needs." 23 Pa.C.S.A. § 2511(b). This analysis involves an examination of "intangibles such as love, comfort, security, and stability." *In re C.P.,* 901 A.2d 516, 520 (Pa. Super. 2006). The Court must assess the bond the child has with his parent and whether termination would sever "existing, necessary, and beneficial relationship[s]." *In re K.Z.S.,* 946 A.2d 753, 760 (Pa. Super. 2008)(citing *In re. C.S.,* 761 A.2d 1197, 1202 (Pa. Super. 2000). The Court must pay "close attention" to the effect severing the bond with a parent has on the child. *In re L.M.,* 923 A.2d 505, 511 (Pa. Super. 2007). However, the child's needs and welfare are the most important factors. *In re K.Z.S.,* 946 A.2d at 760. In this case, the Agency established terminating Mother and Father's parental rights serves E.K. and B.K., Jr.'s best interest.

Mother and Father attended 48 visits with E.K. and B.K., Jr. Testimony provided that during these visits, E.K. and B.K., Jr. did not listen to Mother and Father and FICS staff were left to direct E.K. and B.K., Jr. Testimony by FICS also provided that E.K. and B.K. Jr. were not overly affectionate with Mother and Father. While E.K. and B.K. Jr. would sometimes greet their parents

10

with hugs, E.K. and B.K., Jr. did not display affection unless Mother and Father requested it. FICS staff further noted that Mother ignored both children at several times throughout different visits.

E.K. and B.K., Jr. were placed with their paternal aunt and uncle in June of 2016. Testimony provided that E.K. and B.K., Jr. are happy to be with their cousins and are excelling in their current environment. Foster mother, Bethany Brinker, testified that when the children were initially placed in their care, E.K. had an issue with hoarding food and both children were on medication for ADHD. B.K., Jr. was also very behind academically. In the last twenty months, these issues have been alleviated. The children are no longer taking medication for ADHD, are behaving appropriately and B.K. Jr. is doing better in school. Foster parents help B.K. Jr. with his reading and he is now reading at a third grade level. Testimony provided that E.K. and B.K., Jr. help with chores and operate in the home as a family unit. E.K. and B.K., Jr. have a loving relationship with their foster family and show love and affection to them. Furthermore, E.K. and B.K., Jr. look to their foster family for their basic needs and support.

John H. McCullough, the attorney for E.K. and B.K., Jr., spoke with the children on March 3, 2018. Attorney McCullough stated that the children were outspoken and expressed that they enjoyed living with their aunt and uncle, but would like to continue visiting with Mother and Father. When asked if visitation would still occur if Mother and Father's rights were terminated, Father testified that he thought his sister would still allow him and Mother to visit with the children.

The Court finds it is in E.K. and B.K., Jr.'s best interest to be placed in a home that can provide for their specific needs. While there is a bond between E.K., B.K., Jr. and Mother and Father, the Court finds E.K. and B.K., Jr.'s need for safety, security and stability outweighs this bond. Furthermore, there is no question that E.K. and B.K., Jr.'s need for love and comfort is best served in the foster home. If the Court were to maintain Mother and Father's parental rights, E.K. and B.K., Jr.

11

would be deprived of a permanent, healthy, safe, and secure parent/child relationship and home. Therefore, the Court finds terminating Mother and Father's parental rights serves E.K. and B.K., Jr.'s developmental, physical, and emotional needs and welfare.

## CONCLUSION

The Court finds the Agency met its burden by proving through clear and convincing evidence the grounds for involuntary termination of Mother and Father's parental rights under 23 Pa.C.S.A. §§2511(a)(2), 2511(a)(5), and 2511(a)(8). Also, termination is in the children's best interest.

BY THE COURT:

AARON L. GINGRICH
JUDGE

Distributed 10-4-18
/srs

c:   Steven S. Snook, Esquire
    Michael S. Gingrich, Esquire
    Stuart A. Cilo, Esq.
    John H. McCullough, Esq.
    CYS
   File

12

21